Filed 2/10/26  P. v. Salazar CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>GONZALO AVELAR SALAZAR,<br><br>    Defendant and Appellant. | D085992<br><br><br><br>(Super. Ct. No. INF2201124) |

APPEAL from a judgment of the Superior Court of Riverside County, Dean Benjamini, Judge.  Request for judicial notice denied.  Affirmed.

Bulldog Law, Mario Tafur, Joshua J. Schroeder and Marco G. Sulpizi, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charlies C. Ragland, Assistant Attorney General, Arlene A. Sevidal and Susan Elizabeth Miller, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Gonzalo Avelar Salazar appeals from a judgment following his jury conviction of sexual penetration by force, fear, or threat (Pen. Code,[1] § 289, subd. (a)(1), count 1), rape by force, fear, or threat (§ 261, subd. (a)(2), count 4), and five other offenses against three victims who had mental or physical disabilities, disorders, or other conditions.  On appeal, he contends: (1) substantial evidence does not support his convictions; (2) the trial court committed various instructional errors; (3) the court committed certain evidentiary errors; (4) the court erred by directing the jury to continue its deliberations; (5) the prosecutor prejudicially erred in various ways; (6) the court was implicitly biased in favor of the victims; and (7) he was denied effective assistance of counsel.  As we explain below, we conclude that substantial evidence supports his convictions, that Salazar has forfeited many of his contentions of error and that, in any event, he has not carried his burden on appeal to show reversible error.  We accordingly affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.  *The Three Victims*

#### 1.  *Crystal*

Crystal Doe has mild Down syndrome and ADHD.[2]  In early 2021, she was 34 years old and living at the Mountain View Apartments in Riverside.  She shared an apartment with her then-boyfriend Joe.  Her friend

---

[1]  All statutory references are to the Penal Code unless otherwise specified.

[2]  At trial, the three alleged victims were each addressed by their real first name and the anonymized last name "Doe."  None of the three are related.  For clarity we use their first names, intending no disrespect.

Lucero introduced her to Salazar. Crystal never dated or had a romantic relationship with Salazar.

On one occasion, Salazar gave Crystal a massage in her apartment. While she was lying on her stomach, he removed his clothing and she felt that his penis was hard. He put his penis in her for "[m]inutes."[3] She had not given him permission to put his penis in her and she did not want him to do so, but she was afraid of Salazar and described him as mean and very aggressive. She told him to stop and pushed him off. He then left.

In April 2021, Crystal moved to the Washington Street Apartments, a residential housing complex for elderly and disabled persons. Her boyfriend Fernando and Salazar lived there with her at times. Crystal testified to a series of unwanted touchings by Salazar that occurred at the Washington Street Apartments.

Once when Crystal was lying on her bed, Salazar pulled down her red pants. Neither Crystal nor Salazar said anything. Crystal pulled up her pants and went to tell Fernando, who was asleep on the living room sofa.

On another occasion, Salazar was visiting at her apartment. Crystal was lying on the living room sofa while Fernando was cooking in the kitchen. When Salazar offered to give Crystal a massage, she said yes. During the massage, Salazar touched her vagina with his fingers. Crystal had not given him permission to touch her vagina and told him to stop. Salazar stopped touching her vagina and left.

Crystal testified about several instances in which Salazar touched her inappropriately in her bedroom. There was a time when Crystal was sleeping

_____

[3]     At trial, Crystal also testified (apparently inconsistently) that Salazar never had sex with her. She also testified that Salazar never gave her a massage at her Mountain View apartment without her friend Lucero being present.

in her bed and she awakened to find Salazar touching her "down there" with his fingers. On another occasion, Salazar tried to get her to suck his penis, grabbing her by the hair. She pushed him away. Salazar told her that he would hit her or "beat the crap out of [her]" if she told anyone. She told her boyfriend anyway. Finally, in a separate incident, a naked Salazar tried to grab Crystal and put his penis in her. However, she "threw" him off her.

In March 2022, Salazar touched Crystal's breasts and grabbed and sucked on her right breast. She had not given him her consent to do so and told him to stop. When Crystal eventually told Salazar to move out of her apartment, he grabbed her by the hair and told her that he would "beat the shit out of [her]."

At trial, Crystal identified two video clips of her. One video was of her relaxing or sleeping in the bathtub and the other was of her sleeping. She had not given anyone permission to film her. She testified that she was scared of Salazar and it was scary for her to testify in front of him.

2.    *Gwendolyn*

Gwendolyn Doe, who had been diagnosed with autism and Asperger's syndrome, also lived at the Washington Street Apartments in April 2021. Her autism made it difficult for her to communicate, especially when in "pressure situations" or when talking about controversial topics. She also found it difficult to stand up for herself. She was asexual and had never had sex. Her disability made certain kinds of touching feel "wrong."

Gwendolyn and Crystal hung out together sometimes. Crystal introduced Gwendolyn to Salazar. Smirking, he made sexual innuendos to Gwendolyn and they engaged in flirtatious banter on about six to 12 occasions. Although she flirted with Salazar to placate him, she did not feel safe with him and had no sexual or other interest in him.

4

On one occasion when Gwendolyn was on her patio, Salazar exposed his penis to her and said, "It looks good, doesn't it?" She replied, "Looks okay." She then added, "You shouldn't do that. Anybody can see that. Don't do that." He then covered himself up.

Another time when Salazar knocked on her door, she opened the door wearing a towel. He asked her if he could "look at those," referring to her breasts. She said no and told him, "I never had sex."

In April 2022, Salazar entered her open front door and hugged her from behind. Although she had not consented to being hugged, she "melted into it" and did not think it was a "bad touch" because at that time she needed comfort. During the hug, she felt something on her lower back that felt like his penis. Salazar told her he wanted to give her a massage and led her to the couch. She felt that something was not right and "red flags" were going up. She did not want a massage, but felt incapacitated like she was "in a trance." He positioned her lying down on the couch and knelt next to the couch.

Gwendolyn was wearing long t-shirt and pajama shorts. Salazar attempted to pull up her shirt, but she stopped him. He also tried to pull down her shorts and underwear. She endeavored to pull them back up, thereby expressing "no" to him. The struggle, which she described as "wrestling" or a "Whac-A-Mole" game, continued for two to three minutes. She felt uncomfortable and heard a beeping sound like a video was being recorded.

Salazar pulled down her pants and began "fingering" her and touching her labia with his fingers. His fingers were moving back and forth and "titillating" her clitoris. He pushed them past her labia and into her vagina

about two to three inches.[4]  She felt "paralyzed" and was focusing on the open front door and the beeping sound.  She asked him whether he was filming her, and he replied no.

When Gwendolyn sat up, her shirt was above her breasts and her shorts and underwear were down.  Salazar began sucking on both of her nipples.  When she heard the beeping sound again, she stood up.  Salazar then asked to use her bathroom to wash his hands.  After he had washed his hands and lifted the toilet seat, she told him to leave.  She did not call police at that time. At trial, she testified that she did not want Salazar to touch her and had not asked him to touch her in the way he did or to have sex with her.

The following day, Salazar returned to Gwendolyn's apartment and knocked on her front door.  As she partially opened the door, she saw him grinning and holding a bottle of massage oil.  She did not let him inside and he left.

3.    *Patricia*

Patricia Doe also lived at the Washington Street Apartments.  She had been diagnosed with mild retardation and suffered from learning and mental health disabilities, including anxiety and depression.  She also had physical disabilities, had difficulty walking, and used a mobility scooter or walker.  Crystal introduced her to Salazar.  Patricia told him that she had scoliosis and he often asked her if she wanted a massage.

---

[4]    Gwendolyn also testified (apparently inconsistently) that Salazar did not "penetrate" her.  On cross-examination, when defense counsel asked Gwendolyn whether she thought Salazar's finger went into her vagina at all, she also answered, "I don't think he did."  On redirect examination, when the prosecutor asked her whether it was true she had told police he put his finger in the labia portion of her vagina she answered "yes," but it did not penetrate her vaginal canal.

6

Once when she was at Crystal's home, Salazar told Patricia that he could massage her back. Because her back was hurting, she agreed. Salazar told Crystal to go to her bedroom. He then told Patricia to lie face down on his massage table. After 20 minutes, he told her to turn over. He tried to take off her shorts, explaining it would be easier for him to do the massage if she was not wearing clothes. Patricia, however, told him to stop and to "knock it off."

While her hands were down by her side, Salazar moved close to Patricia and placed her hand on his pants over his erect penis. He also caressed her breasts with his hands, pressing hard on them. When he asked her if it was okay, she replied that he was hurting her. When she told him to stop, he complied. She told him to stop massaging her, put her clothes back on, and left Crystal's apartment. She did not tell Crystal what Salazar had done to her.

## B.    *The Investigation and Charges*

After Gwendolyn heard that Salazar had a video of an incident with her, she reported his sexual assaults to police. When police arrived, she read them a letter which she had just written about the incidents. Her letter stated that she had not initially reported the incident in her apartment because she believed it was consensual. During her interview, she cried, appeared distraught, and had a hard time verbalizing the incidents. As she was talking with police, Salazar walked by her apartment window and she pointed toward him. Police subsequently placed him under arrest.

Patricia also reported that Salazar sexually assaulted her. She told police that he removed her shirt and shorts and made skin-to-skin contact with her breasts and nipples for about three to four minutes. While doing so, he told her, " 'You like it. You like it.' "

7

After Gwendolyn and Patricia reported their incidents to police, Crystal approached police officers who were at the apartment complex. She told the police that on March 13, 2022, she awakened from a nap and found Salazar massaging her arms and body. He then pulled down her pants and forced his penis inside her without her consent. Two days later, she kicked him out of her apartment. During the interview, police observed that Crystal was jumping around from subject to subject.

In May 2022, police recorded an interview with Salazar.[5] He said he believed he was being interviewed because he had been told he had done a massage wrong and they were saying he had used a part of him that he should not have used. Salazar conceded he had videotaped Gwendolyn without her permission. He also admitted that he had put his mouth on her nipple. When police asked if he had permission to do that, Salazar said, "No." Salazar denied that he had touched Gwendolyn's vagina.

A search of Salazar's phones found videos, including one of Crystal sleeping in the bathtub and one of her sleeping in bed. His phones also contained many photos of Crystal. However, police never located the video of Gwendolyn on Salazar's phone.

Ultimately, a second amended information was filed charging Salazar with seven counts: (1) penetration of Gwendolyn's genital opening by use of force, violence, duress, menace, and fear and against her will for the purpose of sexual arousal, gratification, and abuse (§ 289, subd. (a)(1), count 1); (2) willfully inflicting on Gwendolyn, an elder or dependent adult, unjustifiable pain and mental suffering (§ 368, subd. (b)(1), count 2); (3) willfully directly and indirectly touching an intimate part of Gwendolyn against her will for the purpose of sexual arousal, gratification, and abuse (§ 243.4, subd. (e)(1),

---

[5] At trial, portions of that taped interview were played for the jury.

count 3); (4) willful and unlawful sexual intercourse with and against the will of Crystal (i.e., rape) by use of force, violence, and fear (§ 261, subd. (a)(2), count 4); (5) willfully directly and indirectly touching an intimate part of Crystal against her will for the purpose of sexual arousal, gratification, and abuse (§ 243.4, subd. (e)(1), count 5); (6) willfully inflicting on Patricia, an elder or dependent adult, unjustifiable pain and mental suffering (§ 368, subd. (b)(1), count 6); and (7) willfully directly and indirectly touching an intimate part of Patricia against her will for the purpose of sexual arousal, gratification, and abuse (§ 243.4, subd. (e)(1), count 7).  Counts 1, 2, 4, and 6 also alleged that the victims were particularly vulnerable (Cal. Rules of Court,[6] rule 4.421, subd. (a)(3)) and that the offenses were carried out with planning, sophistication, and professionalism (rule 4.421, subd. (a)(8)).  The information also alleged that Salazar committed the offenses in counts 1 and 4 against more than one victim (§ 667.61, subd. (e)(4)).

## C.  *The Trial, Verdict and Judgment*

At trial, the prosecution presented the testimony of the three victims, police officers, and other witnesses substantially as described above.  In his defense, Salazar offered the testimony of one of his massage customers who had found his services online.  She testified that she did not have any negative experiences during the two massages that he gave her.  In fact, that customer allowed Salazar to stay with her for two weeks when he needed a place to live and she had no problems with him during that time.

---

[6]    All rule references are to the California Rules of Court unless otherwise specified.

Salazar also presented the testimony of Juanita N., the manager of the Washington Street Apartments, who said Gwendolyn had reported to her that Salazar had sexually assaulted her. Gwendolyn was crying and not acting like herself when she told Juanita about the sexual assault. Juanita testified Gwendolyn had given Salazar permission to give her a massage and "minor things" happened until "one part of it went too far." Gwendolyn also told her that she thought Salazar had secretly recorded the incident because she heard a beeping noise. Juanita characterized Gwendolyn as a very good person who liked to help people. She was quiet and kept to herself most of the time.

After Gwendolyn reported the sexual assault by Salazar, word spread within the apartment community. Crystal contacted Juanita and told her that Salazar had done the same thing to her. Although Juanita thought that Crystal was a good person, she also believed Crystal was not a dependable reporter and did not always follow the apartment complex's rules. Crystal told stories, liked to talk, and was an attention seeker. Although Crystal did not have many friends, Juanita believed that the friends she had "use[d] her." Juanita testified that after Gwendolyn reported Salazar's sexual assault, Crystal became aware that people in the apartment complex were giving Gwendolyn special attention. Similarly, Juanita stated that Patricia looked for drama and attention and that she did not always believe everything Patricia said.

The jury returned guilty verdicts on all seven counts and found true the related allegations described above. The trial court entered a judgment based on the jury's verdicts and sentenced Salazar to a total of: three years and 30 years to life consisting of two consecutive indeterminate terms of 15 years to life on counts 1 and 4; determinate prison terms of three years on

counts 2 and 6 (count 2 stayed under § 654); and imposing and staying 180 days in jail on counts 3, 5, and 7.  Salazar timely filed a notice of appeal.[7]

## DISCUSSION

The first heading of the "Discussion" section of Salazar's opening brief is entitled "Matters Preserved for Appeal."  He briefly lists nine instances in which he claims to have objected to evidence or instructions, but it is unclear whether he intends each as a separate assertion of error on appeal.  We consider them only to the extent they are developed with cogent argument and appropriate citation to relevant authority.  (*People v. Freeman* (1994) 8 Cal.4th 450, 482, fn. 2. ["To the extent defendant perfunctorily asserts other claims, without development and, indeed, without a clear indication that they are intended to be discrete contentions, they are not properly made, and are rejected on that basis"].)

---

[7]     On January 16, 2025, Salazar requested that we take judicial notice of five matters:  (1) "[t]he fact and proposition of generalized knowledge that human beings are not automatically rational"; (2) "[t]he fact and proposition of generalized knowledge that the United States is experiencing an epidemic of loneliness"; (3) "[t]he fact and proposition of generalized knowledge that persons with disabilities were mistreated in several trackable ways, including by being isolated significantly more than the general public during the COVID pandemic"; (4) "[t]he decisional law of California and the United States regarding the reality that [*Buck v. Bell* (1927) 274 U.S. 200] was never overruled [and] is still good law"; and (5) "[t]he California Rule 3.3 of professional conduct for members of the bar regarding the lawyer's duty of candor toward the tribunal."  On January 27, the People filed an opposition to his request for judicial notice.  On January 30, we issued an order stating that we would consider his request for judicial notice and the People's opposition together with the appeal.  We now deny his request for judicial notice.

## A.    *Sufficiency of the Evidence*

Salazar contends that substantial evidence does not support his convictions. In particular, he argues that the evidence was insufficient to support findings by the jury that the victims did not consent to his touching and that during their massages he had sexually penetrated or touched them.

When a defendant challenges the sufficiency of the evidence, we "review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which . . . a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) To be "substantial," the evidence must be of ponderable legal significance and reasonable in nature, credible, and of solid value. (*Id.* at p. 576.) We must "presume[] in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) "[U]nless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction." (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) "[I]t is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. [Citation.] Thus, if a verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder." (*People v. Jones* (1990) 51 Cal.3d 294, 314.)

The standard of review is the same when the People rely primarily on circumstantial evidence. (*People v. Bean* (1988) 46 Cal.3d 919, 932 (*Bean*).) "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which

12

suggests guilt and the other innocence [citations], it is the jury, not the appellate court[,] which must be convinced of the defendant's guilt beyond a reasonable doubt. ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." ' " (*Id.* at pp. 932–933.)

In support of his contention that substantial evidence does not support his seven convictions, the legal analysis in Salazar's opening brief consumes only one and one-half pages and is presented in a conclusory manner without citation to the evidence in the record. This type of inadequate presentation would justify our treating the contentions as forfeited. (See, e.g., *Jones v. Superior Court* (1994) 26 Cal.App.4th 92, 99; *Holden v. City of San Diego* (2019) 43 Cal.App.5th 404, 418–419.) But in fairness to Salazar, we elect to briefly discuss the substantial evidence that supports each of his seven convictions and make our best efforts to address his specific contentions.[8]

1.    *Lack of Consent*

Salazar first argues there is insufficient evidence to support findings that the victims did not consent to his touching. Without citing to any specific pages in the record, he argues that the victims' testimony was "simply too vague, too uncertain, and too self-contradictory for any reasonable jury to conclude that the victims did or did not consent to [his] touch." Although he has not specified which of the seven counts required

_____

[8]    In response to argument by the Attorney General and questions from the court, defense counsel at oral argument appropriately conceded a number of rule violations in the briefing. Given the number and seriousness of violations we have noted, we think it appropriate to remind appellate counsel of their professional obligation to provide competent representation and, if necessary, to associate or consult with another lawyer who possesses the necessary skill and experience. (See Rules Prof. Conduct, rule 1.1.)

13

proof of the element of lack of consent, we nevertheless conclude that substantial evidence supports findings by the jury that none of the three victims consented to his sexual intercourse, sexual penetration, or other unlawful sexual touching.[9]

With regard to Crystal, she testified that she had not given Salazar permission to put his penis in her during the incident at her Mountain View Apartments home. When Salazar pulled down her pants while she was lying on her bed at her Washington Street Apartments home, the jury could reasonably infer that she had not consented to that conduct because she immediately pulled up her pants and went to tell Fernando. When Crystal was lying on the sofa and agreed to receive a massage by Salazar, she testified that she had not given him permission to touch her vagina and told him to stop. As to Salazar touching Crystal "down there" when she awakened from sleeping, the jury could reasonably infer she had not consented to that touching while she was asleep. When Salazar tried to get Crystal to suck his penis and grabbed her by the hair, the jury could reasonably infer she had not consented to that conduct because she pushed him away and then told her boyfriend. As to the incident during which a naked Salazar tried to grab Crystal and put his penis in her, the jury could reasonably infer she had not consented to that conduct because she "threw" him off her. And when Salazar touched, grabbed, and sucked on Crystal's breast, she testified that she had not given him her consent to do so and told him to stop. Therefore, contrary to Salazar's conclusory assertion, there is

---

9 Most of the charges required the prosecution to prove that the victim did not consent (count 1—§ 289, subd. (a)(1)) or that the act was accomplished against the victim's will (count 4—§ 261, subd. (a)(2); counts 3, 5 & 7—§ 243.4, subd. (e)(1)). The remaining two counts charged willful infliction of physical or mental suffering on an elder in violation of section 368, subdivision (b)(1).

14

substantial evidence to support findings by the jury that Crystal did not consent to sexual intercourse or other unlawful touching as found by the jury.

Likewise, there is substantial evidence to support findings by the jury that Gwendolyn did not consent to sexual penetration or other unlawful touching by Salazar. During the incident that began with Salazar hugging Gwendolyn from behind, then inserting his fingers into her vagina, and ending with his sucking on her nipples, the jury could reasonably infer that she may have implicitly consented to the hug, but did not consent to his subsequent sexual touching. Gwendolyn testified that during the incident she felt something was not right and did not want a massage, but she was incapacitated and "in a trance." She further testified that when he tried to pull down her shorts and underwear, she tried to pull them back up and thereby expressed "no" to him. She explained that when Salazar began "fingering" her vagina and "titillating" her clitoris, she felt "paralyzed" and stood up while he was sucking on her nipples when she heard the beeping noise again.

Finally, there is substantial evidence to support a finding by the jury that Patricia had not consented to Salazar's unlawful touching. Regarding the incident when Salazar caressed her breasts with his hands during a massage, Patricia told him to stop, put her clothes back on, and left Crystal's apartment. The jury could infer from Salazar's offer to massage her back and then Patricia's direction that he stop touching her breasts that she had not consented to anything beyond a back massage.

Accordingly, we conclude there is substantial evidence to support the jury's findings that all three victims did not consent to sexual intercourse, sexual penetration, or other unlawful touching by Salazar. To the extent the jury's findings were based on circumstantial evidence, we reject Salazar's

15

assertion that the jury failed to comply with the trial court's instruction with CALCRIM No. 224.[10] As discussed above, it is the jury's responsibility—and not that of the appellate court—to weigh the evidence and determine whether it is convinced the defendant is guilty beyond a reasonable doubt. (*Bean*, *supra*, 46 Cal.3d at p. 932.) Therefore, even if we were to believe the circumstances in this case might reasonably be reconciled with findings that the victims consented to Salazar's conduct, such findings would not warrant reversal of his convictions because we conclude the circumstances reasonably justify the jury's findings that the victims did not consent to it. (*Id*. at pp. 932–933.)

2. *Sexual touching*

Salazar also contends there was insufficient evidence to support the jury's findings that his touching of the three victims exceeded the scope of a normal massage and instead constituted unlawful sexual intercourse, penetration, or touching. In his opening brief, he argues that "significant reasonable doubt exists on the record about whether [he] ever touched the victims with his penis much less had sex with any of them or touched their breast for a purpose other than giving a massage." In support of this argument, Salazar cites the purported "self-impeaching nature of the victims' testimony" on the factual issue of whether sexual touching ever happened "effectively muddled the issue of consent to a point that it [could not] possibly be comprehended by any reasonable jury." Such a conclusory argument is inadequate for Salazar to carry his burden on appeal. Nevertheless, based on our review of the record, we conclude that despite the possible vagueness

---

10    CALCRIM No. 224 instructed the jury in part that if it could "draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions points to innocence and another to guilt, you must accept the one that points to innocence."

16

and/or internal contradictions in some of the victims' testimony regarding Salazar's conduct, there is substantial evidence to support the jury's findings that Salazar did, in fact, commit the unlawful sexual intercourse, penetration, or touching as alleged in the second amended information. We are similarly unpersuaded by Salazar's undeveloped assertion, without citation to the record, that the victims' testimony was so vague, contradictory, and/or inconsistent that no reasonable jury could find he unlawfully touched them as alleged in the information.

3. *Multiple Reasonable Interpretations of the Evidence*

Salazar also argues that the insufficiency of the evidence is reflected by the jury's failure to comply with the trial court's instructions—and specifically CALCRIM No. 224—in finding him guilty rather than adopting an interpretation of the evidence that pointed to his innocence. Again, however, Salazar fails to develop this argument by identifying the specific evidence he believes is subject to conflicting reasonable interpretations. In any event, as we have noted, CALCRIM No. 224 guides the jury's evaluation of the evidence in the first instance. (See *People v. Giddens* (2021) 72 Cal.App.5th 145, 156.) It does not apply to an appellate court's review of the record for substantial evidence. (See, e.g., *People v. Ceja* (1993) 4 Cal.4th 1134, 1139 ["reviewing court may not reverse the judgment merely because it believes that the circumstances might also support a contrary finding"].)

4. *Section 1118.1 Motion*

Salazar contends that the trial court prejudicially erred by denying his section 1118.1 motion for judgment of acquittal on count 2 on the ground there was insufficient evidence to support a finding that Gwendolyn was an elder or dependent adult within the meaning of section 368, subdivision (b)(1). Although his argument could be deemed forfeited for failure to present

17

any substantive legal analysis on that issue, we nonetheless address the merits of the issue and conclude that the court properly denied the motion. As the court instructed the jury with CALCRIM No. 830, a "dependent adult" within the meaning of section 368, subdivision (h) is "someone who is between 18 and 64 years old and has physical or mental limitations that restrict his or her ability to carry out normal activities or to protect his or her rights. This definition includes an adult who has physical or developmental disabilities or whose physical or mental abilities have decreased because of age." Here, Gwendolyn testified that she had autism, which caused her anxiety, made certain kinds of touching feel "wrong," made it difficult for her to communicate, and made it difficult for her to stand up for herself. She was also living in the Washington Street Apartments, which is a residential housing complex for elderly and disabled persons.

A section 1118.1 motion for judgment of acquittal "at the close of the prosecution case [can] be granted only if the evidence is insufficient to sustain a conviction on appeal. The trial judge does not weigh the credibility of the prosecution evidence, for that would invade the province of the jury which is the trier of fact." (*People v. Partner* (1986) 180 Cal.App.3d 178, 184, fn. omitted.) On appeal from a denial of a section 1118.1 motion, we may not set aside that denial on the ground of insufficiency of the evidence unless it "clearly appears that upon no hypothesis whatsoever is there sufficient substantial evidence to support the conclusion reached by the court below." (*People v. Wong* (1973) 35 Cal.App.3d 812, 828; see also *People v. Crittenden* (1994) 9 Cal.4th 83, 139, fn. 13 [in reviewing trial court's ruling on section 1118.1 motion, we consider the evidence, and all reasonable inferences therefrom, and determine whether there was substantial evidence to support a conviction].)

18

In denying Salazar's section 1118.1 motion at the close of the prosecution's case-in-chief, the court found that there was substantial evidence for the jury to find Gwendolyn was a dependent adult. By citing evidence and inferences that would support a contrary finding, Salazar does not show there was insufficient evidence.[11] Accordingly, we reject Salazar's assertion and agree with the trial court that there was substantial evidence to show that Gwendolyn was a dependent adult within the meaning of section 368, subdivision (b)(1).

## B. *Instructional Issues*

Salazar contends the trial court erred in instructing the jury. "The burden of affirmatively demonstrating error is on the appellant." (*Fundamental Investment etc. Realty Fund v. Gradow* (1994) 28 Cal.App.4th 966, 972.) A judgment is presumed to be correct and an appellant has the burden to overcome that presumption of correctness and demonstrate reversible error. (*Jameson v. Desta* (2018) 5 Cal.5th 594, 608–609.) The presumption of correctness includes presumptions that the trial court followed the law and that the jury followed the instructions given it. (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 398 [presumption that trial courts are aware of and follow applicable law]; *People v. Case* (2018) 5 Cal.5th 1, 32 [presumption jury followed instructions].)

"An appellant must provide an argument and legal authority to support his contentions. This burden requires more than a mere assertion that the judgment is wrong." (*Benach v. County of Los Angeles* (2007) 149 Cal.App.4th

---

[11]  In particular, he argues that Gwendolyn did not receive a diagnosis of autism until later in life and that she worked and was functioning as an independent adult earlier in her life. However, that evidence does not preclude a finding by the jury that she was a dependent adult at the time of Salazar's commission of count 2.

19

836, 852 (*Benach*).) "Issues do not have a life of their own: if they are not raised or supported by [substantive] argument or citation to authority, we consider the issues waived." (*Jones v. Superior Court, supra*, 26 Cal.App.4th at p. 99.) Accordingly, an appellant may be deemed to have waived or forfeited an argument on appeal if his or her appellate briefs do not support that argument by pertinent or cognizable legal argument or analysis or proper citation of authority. (*Ibid.*; *Benach*, at p. 852.) Furthermore, an appellant waives or forfeits contentions that are conclusory and supported only by counsel's opinion or argument without citation to any recognized legal authority. (*Ewald v. Nationstar Mortgage, LLC* (2017) 13 Cal.App.5th 947, 948 (*Ewald*).) Moreover, if a party does not object to a specific action in the trial court, that party is generally precluded from challenging that action on appeal and is deemed to have waived or forfeited that purported error. (*People v. Trujillo* (2015) 60 Cal.4th 850, 856 (*Trujillo*); *People v. McCullough* (2013) 56 Cal.4th 589, 593 (*McCullough*) [criminal defendant who does not challenge trial court ruling below forfeits claim of error on appeal]; *Keener v. Jeld-Wen, Inc.* (2009) 46 Cal.4th 247, 264.)

An appellant may not challenge a jury instruction that is correct in law as being too general or incomplete unless he or she requested a clarifying instruction below. (*Metcalf v. County of San Joaquin* (2008) 42 Cal.4th 1121, 1130–1131 (*Metcalf*).) Parties whose affirmative conduct invites the trial court to commit an instructional or other error, and does not merely acquiesce to it, will be estopped from asserting that error as a basis for reversal on appeal. (*People v. Bell* (2019) 7 Cal.5th 70, 109.) To the extent they offered alternative instructions that were refused, they must show that those instructions were correct statements of law and should have been given in addition to, or in place of, the trial court's instructions. (*Soule v.*

*General Motors Corp.* (1994) 8 Cal.4th 548, 573 (*Soule*); *Morgan v. J-M Manufacturing Co., Inc.* (2021) 60 Cal.App.5th 1078, 1087 [party is entitled on request to correct, nonargumentative instructions on every theory of the case advanced by it that is supported by substantial evidence].) An instruction should state rules of law generally without overemphasizing portions of the evidence or, in effect, making an argument to the jury. (*Slayton v. Wright* (1969) 271 Cal.App.2d 219, 238.)

Finally, a party claiming instructional error is generally required to show not merely a mistake in an instruction, but also that the error was prejudicial. (Cal. Const., art. VI, § 13 ["No judgment shall be set aside . . . on the ground of misdirection of the jury . . . , unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice"].) The Supreme Court has construed that standard of prejudice as follows: "[M]isdirection of the jury is not subject to reversal unless an examination of the entire record establishes a reasonable probability that the error affected the outcome. (Cal. Const., art. VI, § 13; *People v. Watson* (1956)] 46 Cal.2d 818, 836, 299 P.2d 243 [(*Watson*)].)" (*People v. Breverman* (1998) 19 Cal.4th 142, 165.) In applying that standard, a reviewing court must "focus[] not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result. . . . Application of the *Watson* standard of appellate review may disclose that, though the error occurred, it was harmless." (*Id.* at p. 177,

21

fn. omitted; see also *People v. Wimer* (2022) 74 Cal.App.5th 113, 135 [citing *Breverman*]; *People v. Campbell* (2015) 233 Cal.App.4th 148, 165–166 [citing *Breverman*].)

### 1. *CALCRIM Nos. 105 and 331*

In a conclusory fashion, Salazar faults the trial court for including the term "communication impairment" along with "developmental disability" and "cognitive or mental impairment" in the standard CALCRIM No. 331 instruction it provided to the jury.[12] He asserts the instruction was "inherently misleading" and was "inappropriately exploited by the prosecution to suggest that the jury could reinterpret the victim testimony to b[e] consistent when it actually impeached itself." Although we could conclude he forfeited that argument for failure to present any substantive legal analysis (*Benach*, *supra*, 149 Cal.App.4th at p. 852), we nevertheless elect to address the merits of his contention.

In using the standard language of the CALCRIM No. 331 instruction, the court correctly stated that determinations regarding any disabilities or communication impairments of the victims or other witnesses were left for the jury to make based on its weighing of the evidence admitted at trial.

---

[12] CALCRIM No. 331 instructed the jury: "In evaluating the testimony of a person with a developmental disability, a cognitive, a mental or a communication impairment, consider all of the factors surrounding that person's testimony, including his or her level of cognitive development. [¶] Even though a person with a developmental disability, a cognitive, a mental or a communication impairment may perform differently as a witness because of his or her level of cognitive development, that does not mean he or she is any more or less credible than another witness. [¶] You should not discount or distrust the testimony of a person with a developmental disability, a cognitive, a mental or a communication impairment solely because he or she has such a disability or impairment."

Contrary to Salazar's assertion, that instruction was not inherently misleading and did not "judicially diagnose[] all three victims with a communication impairment." Rather, it informed the jury that *it* was to make the determinations regarding any disabilities or communication impairments of the victims or other witnesses based on its weighing of the evidence.

CALCRIM No. 331 also instructed the jury that it should consider all of the factors in evaluating the testimony of a witness with a developmental, cognitive, or mental disability or communication impairment and should not discount or distrust the testimony of a person with a developmental disability, a cognitive, a mental or a communication impairment *solely* because he or she has such a disability or impairment. As a result, the instruction did not favor the testimony of the three victims, much less insulate them from the jury's consideration of any weaknesses in their testimony. We also note that the court instructed the jury with CALCRIM No. 226[13] regarding the jury's evaluation of the testimony of witnesses and, in so instructing, made it clear that the jury alone was to decide the credibility of the testimony of the victims and other witnesses.

In a related argument, Salazar contends that CALCRIM Nos. 105 and 331 provided inadequate guidance to the jury on how to deal with testimony from the alleged victims that was inherently contradictory and self-impeaching.[14] He argues that the victims' testimony was so nonresponsive

---

[13] CALCRIM No. 226 instructed in relevant part: "You alone must judge the credibility or believability of the witnesses. . . . You must judge the testimony of each witness by the same standards, setting aside any bias or prejudice you may have."

[14] We presume the reference in Salazar's opening brief to CALCRIM No. 150 is a transpositional error, as there is no such instruction. Consistent

and self-contradictory that the court should have sua sponte modified those instructions to state that the jury should acquit him if it did not find substantial evidence to support his guilt on the charges against him (e.g., if conflicting circumstantial evidence supports a version of events showing his innocence).

To the contrary, however, we conclude that the trial court properly instructed the jury on how to evaluate the victims' testimony and handle conflicting testimony and circumstantial evidence, as well as how to apply the reasonable doubt burden of proof required to find him guilty on the charges against him.  (See, e.g., CALCRIM Nos. 103, 105, 220, 224, 226, 302 & 331.) In particular, it properly instructed with CALCRIM Nos. 105 and 226 that in evaluating a witness's testimony, the jury may consider "anything that reasonably tends to prove or disprove the truth or accuracy of that testimony," including "[h]ow well could the witness see, hear, or otherwise perceive the things about which the witness testified?" and "[h]ow well was the witness able to remember and describe what happened?"  The court also told the jury not to "automatically reject testimony just because of inconsistencies or conflicts."  Finally, it utilized CALCRIM No. 224 to explain that if the jury could "draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions points to innocence and another to guilt, [it] must accept the one that points to innocence."

---

with CALCRIM No. 105, the jury was told that it "alone must judge the credibility or believability of the witnesses" and provided with various factors it may consider in evaluating a witness's testimony.  It was also instructed: "Do not automatically reject testimony just because of inconsistencies or conflicts.  Consider whether the differences are important or not.  People sometimes honestly forget things or make mistakes about what they remember."

24

Salazar does not argue that any of these instructions were incorrect. Rather, he contends that clarifying or amplifying language should have been added. But he made no such request and has not presented any substantive legal analysis showing that the court had a sua sponte duty to do so. As a result, he forfeited any such challenge to the court's instructions. (*People v. Jones* (2013) 57 Cal.4th 899, 969 (*Jones*); *Metcalf*, *supra*, 42 Cal.4th at pp. 1130–1131.) In any event, we conclude that the court's instructions, discussed above, properly informed the jury on how to handle conflicting testimony, including any allegedly self-contradictory testimony by the victims. His counsel then could employ those instructions in explaining to the jury why the inconsistencies in the testimony raised a reasonable doubt as to Salazar's guilt.

2. *CALCRIM No. 3226*

Salazar contends the trial court prejudicially erred by instructing the jury with CALCRIM No. 3226, apparently arguing there was insufficient evidence to support a finding by the jury that any of the three victims were particularly vulnerable as to him.[15] In arguing that there was insufficient

___

15 The instruction stated in part:

"If you find the defendant guilty of the crimes charged in Count 1, 2, 4, or 6 . . . , you must then decide whether, for each crime, the People have proved the additional allegation that [the] victim of those crimes was a particularly vulnerable victim within the meaning of [rule] 4.421(a)(3). [¶] . . . [¶]"

"Particularly vulnerable includes being defenseless, unguarded, unprotected, or otherwise susceptible to the defendant's criminal act to a special or unusual degree. [¶] In determining whether Gwendolyn Doe, Patricia Doe and/or Crystal Doe [were] particularly vulnerable, you

25

evidence to support that instruction, Salazar notes there was evidence showing he was Crystal's guest and she recommended him to her friends for massage services. He also notes that he never disobeyed the victims when they asked him to stop or leave.

Salazar's argument misconstrues and/or misapplies the substantial evidence standard. His citation to evidence that could have supported a contrary finding does not show otherwise. To the extent he additionally argues that instruction did not adequately explain how Gwendolyn's trauma and conduct may have been due to her autism instead of her discomfort with his sexual touching, he failed to submit a clarifying instruction to that effect below, and therefore forfeited any purported inadequacy in CALCRIM No. 3226. (*Metcalf*, *supra*, 42 Cal.4th at pp. 1130–1131.)

3.     *CALCRIM No. 207*

Salazar appears to contend that the trial court erred by instructing the jury with CALCRIM No. 207. In particular, he argues that the court should have, at the very least, instructed that the lack of an exact date for the various charges "does not justify clear inconsistencies and paradoxes in victim testimony regarding timelines and dates."

But Salazar did not object to CALCRIM No. 207 as given, nor request the clarifying or amplifying language he now argues should have been included. " '[A] party may not complain on appeal that an instruction correct

---

should consider all of the circumstances surrounding the commission of the crime, including the characteristics of Gwendolyn Doe, Patricia Doe and/or Crystal Doe, and the manner and setting in which the crime was committed. [¶] As it pertains to Counts 2 and 6, you may not find vulnerability based solely on physical or mental limitations, which are an element of Counts 2 and 6." (CALCRIM No. 3226.)

26

in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.' " (*Jones, supra*, 57 Cal.4th at p. 969; see also *Metcalf, supra*, 42 Cal.4th at pp. 1130–1131.)  By failing to object and request specific clarifying or amplifying language, we conclude that he forfeited any purported inadequacy in, or other error in giving, that instruction.  (*Jones*, at p. 969; *Metcalf*, at pp. 1130–1131.)

In any event, CALCRIM No. 207 as given by the trial court, did not have the effect of instructing the jury that the victims' inconsistencies were justified.  Furthermore, any possible ambiguity in that instruction was clarified by the court's instructions CALCRIM Nos. 105 and 226, which informed the jury on how to properly evaluate the credibility of the witnesses, including any inconsistencies in their testimony.

4. *Rereading of Charges Without Titles*

In a somewhat convoluted argument, Salazar maintains that the trial court prejudicially erred by "re-reading the charges to the jury without the titles."  In his view, omitting the title deemphasized the element of force.  To be clear, what the court "re-read[]" were not the *charges* against Salazar but rather the *instruction* (see CALCRIM No. 1000) that defined the required elements for the violation of section 261, subdivision (a)(2) charged in count 4.  In response to a juror question asking for "more clarification about the title" of the instruction and suggesting there might be a "discrepancy between the description in the title and the elements themselves," the court told the jury to "ignore the titles."  According to the judge, "[t]he titles are meaningless other than to tell you which count and which offense you are working on and how they correspond to the appropriate verdict form. . . . What you go by is the elements, not the title . . . ."  The court later reread the

27

instruction, but emphasized that "any discrepancies between the title which does use the word 'force, fear, or threats,' the second line which just says 'force,' and then the instructions themselves have different elements, you are to follow the instructions themselves. You can pretty much ignore the title."

As defense counsel later conceded, the court was correct in telling the jury to "disregard the title." (See *People v. Torres* (2011) 198 Cal.App.4th 1131, 1147, fn. 11.) In any event, Salazar fails to explain how the text of the instruction without its title made it easier for the jury to convict him on that charge. In so arguing, he merely speculates that was the result and does not present any substantive legal analysis in support of his argument. Furthermore, we note that the verdict form for count 4 included the title, thereby diminishing any purported misleading effect of the court's rereading of the instruction without its title.

## C.  *Evidentiary Issues*

Salazar contends the trial court prejudicially erred by excluding certain defense evidence and permitting leading questions by the prosecution. Evidence Code section 353 provides that a judgment shall not be reversed "by reason of the erroneous admission of evidence unless" "[t]here appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion . . . ." (*Ibid.*; *People v. Welch* (1972) 8 Cal.3d 106, 114–115 (*Welch*).) "It is the general rule that questions related to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection at the trial on the ground sought to be urged on appeal." (*Ibid.*; see also *People v. Delgado* (2017) 2 Cal.5th 544, 580 (*Delgado*); *People v. Hart* (1999) 20 Cal.4th 546, 615 (*Hart*) [because defendant did not object

below and set forth specific grounds for objection, issue of erroneous admission of evidence may not be raised for first time on appeal].)

1.    *Exclusion of Defense Evidence*

Salazar asserts the trial court erroneously precluded him from presenting evidence that Crystal claimed to have suffered 24 miscarriages. In so arguing, however, and contrary to the requirement in rule 8.204(a)(1)(C), Salazar's opening brief does not cite to any specific portions of the record showing such purported exclusion of evidence by the trial court. Likewise, his brief does not cite any authority or present any substantive legal analysis in support of his argument. Although such failures could be deemed as forfeiture (*WFG National Title Ins. Co. v. Wells Fargo Bank, N.A.* (2020) 51 Cal.App.5th 881, 894 (*WFG National*); *Benach, supra,* 149 Cal.App.4th at p. 852), we nevertheless attempt to address the merits of his argument.

In a conclusory manner, Salazar asserts that the trial court "could have and should have consulted hospital records to find out whether Crystal was lying [presumably about having 24 miscarriages]." But he does not cite, and we are unaware of any authority requiring a trial court to sua sponte investigate and obtain evidence for the defense that may reflect on a

29

prosecution witness's credibility.[16] We reject any such suggestion by Salazar and further conclude he has not carried his burden on appeal to show the court erred by excluding such evidence. (*Benach, supra,* 148 Cal.App.4th at p. 852.)

2. *Leading Questions*

Salazar contends the trial court prejudicially erred by allowing the prosecutor to repeatedly ask leading questions of the victims. In particular, he notes that he objected to the prosecutor's leading question asking Crystal whether there was "ever a time where [Salazar] had sex with you?" Although the court overruled his objection, Crystal answered: "He tried to, but I didn't let him." Regardless of whether the trial court erred by overruling his objection to that leading question, Salazar has not shown, nor could he show, that Crystal's answer to that leading question was prejudicial to him. Specifically, by essentially answering "no" to that question, her testimony did not support the prosecution's case and could only have supported his defense. Therefore, it is not reasonably probable that Salazar would have obtained a more favorable verdict had the court not purportedly erred by overruling that leading question. (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 800–802 (*Cassim*); *Watson, supra,* 46 Cal.2d at p. 836.)

---

16    Salazar also argues that his defense counsel performed deficiently for not seeking hospital records that might disprove Crystal's purported claim and detract from her credibility. He cites to nothing in the record to support this assertion and offers no substantive legal argument showing that his counsel had such a duty. Accordingly, we conclude he forfeited that argument on appeal. (*WFG National, supra,* 51 Cal.App.5th at p. 894; *Benach, supra,* 149 Cal.App.4th at p. 852.) In any event, a claim of ineffective assistance of counsel is rarely amenable to resolution on direct appeal and must await the development of a full record on a petition for writ of habeas corpus. (See generally *People v. Mai* (2013) 57 Cal.4th 986, 1009 (*Mai*).)

Salazar then expands his argument to other questions asked by the prosecutor. He references the prosecutor's question, "Was there ever a time . . . other than what you told us where [Salazar] started to give you a massage and then spanked your butt?" Crystal answered, "Yes," and then described the incident. She thereafter testified inconsistently that he never spanked her butt. Again, it is difficult to see how Crystal's inconsistent testimony—whether in response to a leading question or otherwise—prejudiced Salazar. In any event, he did not timely and specifically object to the initial leading question asked by the prosecutor and therefore forfeited any challenge on that basis. (Evid. Code, § 353; *Welch, supra*, 8 Cal.3d at pp. 114–115; *Delgado, supra*, 2 Cal.5th at p. 580; *Hart, supra*, 20 Cal.4th at p. 615.)

Salazar also challenges "the general prevalence of leading questions asked by the prosecution and answered in exceedingly contradictory ways by the victims." But he does not cite to any specific questions on specific pages of the reporter's transcript purportedly showing a "general prevalence," nor does he show he objected to those questions. So even assuming those questions led to nonresponsive and/or contradictory testimony by the victims as he asserts, Salazar forfeited any challenge to those purported erroneous questions as well as to the victims' answers in response. (Evid. Code, § 353; *Welch, supra*, 8 Cal.3d at pp. 114–115; *Delgado, supra*, 2 Cal.5th at p. 580; *Hart, supra*, 20 Cal.4th at p. 615.)

Finally, Salazar argues that based on the purported "back and forth" testimony of the victims on material facts, the trial court should have declared a mistrial. But his trial counsel made no motion for a mistrial, and on appeal he presents no substantive legal analysis showing the court had a sua sponte duty to do so based on the record in this case. Accordingly,

31

we conclude he has forfeited any appellate challenge to the court's failure to declare a mistrial.[17] (*Benach, supra*, 149 Cal.App.4th at p. 852; *Trujillo, supra*, 60 Cal.4th at p. 856; *McCullough, supra*, 56 Cal.4th at p. 593.)

## D. *Jury Deliberations*

Salazar contends that the trial court prejudicially erred by directing the jury to continue deliberating after its foreperson informed the court that the jury was hung on count 4 with a vote of 11 to 1. "A trial court may ask jurors to continue deliberating when, in the exercise of its discretion, it finds a 'reasonable probability' they will be able to reach agreement." (*People v. Howard* (2008) 42 Cal.4th 1000, 1029 (*Howard*); see also § 1140.) In exercising its discretion, the trial court " 'is not bound to take as final the statement of the [jurors] that they cannot agree upon a verdict.' " (*People v. Valdez* (2012) 55 Cal.4th 82, 159.) In one case in which the jurors had been deadlocked at 11 to 1 for days, the trial court directed them to continue deliberating. (*People v. Pride* (1992) 3 Cal.4th 195, 264–265 (*Pride*).) The Supreme Court concluded that such direction by the trial court was not inherently coercive or an abuse of its discretion because the "jury was never told it must reach a verdict, nor were any other constraints placed on [its] deliberations." (*Id.* at pp. 265–266.)

Here, when the trial court asked the jurors if there was something it could do to help with their deadlocked deliberations on count 4, one juror

---

[17] To the extent Salazar also argues, in a conclusory manner, that his defense counsel should have moved for a mistrial and the jury should have acquitted him based on the purported "back and forth" testimony of the victims, he likewise has forfeited any such claims made in conjunction with this argument for failure to present any substantive legal analysis in support of those claims. (*Benach, supra*, 149 Cal.App.4th at p. 852; *Jones v. Superior Court, supra*, 26 Cal.App.4th at p. 99; *Ewald, supra*, 13 Cal.App.5th at p. 948.)

stated: "I would read the law one more time and allow everybody to come back tomorrow to think about it." The court then dismissed the jury for the evening with directions that it reconvene in the morning and continue its deliberations. The following day, the jury returned its verdicts, including a guilty verdict on count 4. Contrary to Salazar's assertion, the trial court's direction that the jury continue deliberating did *not* "slant the [deliberation] process" to encourage jury unanimity. Rather, the court exercised its discretion based on finding there was a reasonable probability that the jury would be able to reach an agreement on count 4. It then properly directed the jury to continue deliberating on that count in the morning. (*Howard*, *supra*, 42 Cal.4th at p. 1029.) As in *Pride*, the trial court's direction here to continue deliberations was not inherently coercive or an abuse of its discretion because the "jury was never told it must reach a verdict, nor were any other constraints placed on [its] deliberations." (*Pride*, *supra*, 3 Cal.4th at pp. 265–266.)

## E.     *Prosecutorial Error*

"[T]he term prosecutorial 'misconduct' is somewhat of a misnomer to the extent that it suggests a prosecutor must act with a culpable state of mind. A more apt description of the transgression is prosecutorial error." (*People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1.) Prosecutorial error "occurs, as a matter of state law, when a prosecutor 'engages in deceptive or reprehensible tactics in order to persuade the trier of fact to convict.' [Citation.] Federal constitutional error occurs only when the prosecutor's actions 'comprise a pattern of conduct that is serious and egregious, such that the trial is rendered so unfair that the resulting conviction violates the defendant's right to due process of law.' " (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 854 (*Daveggio*).) In the context of closing

33

argument, a prosecutor is given wide latitude to argue vigorously as long as it is fair comment on the evidence, including reasonable inferences to be drawn therefrom. (*Hill*, at p. 819.)

"In order to be entitled to relief under state law, defendant must show that the challenged conduct raised a reasonable likelihood of a more favorable verdict." (*People v. Blacksher* (2011) 52 Cal.4th 769, 828, fn. 35.) "Under federal law, relief is not available if 'the challenged conduct was . . . harmless beyond a reasonable doubt.' " (*Daveggio*, *supra*, 4 Cal.5th at p. 854.)

A defendant generally may not complain on appeal of prosecutorial error unless he or she timely and specifically objected to that purported prosecutorial error and requested that the trial court admonish the jury to disregard that error. (*People v. Fuiava* (2012) 53 Cal.4th 622, 679 (*Fuiava*); *People v. Riggs* (2008) 44 Cal.4th 248, 298 (*Riggs*); *Cassim*, *supra*, 33 Cal.4th at pp. 794–795.) If a defendant fails to do so, any challenge to that purported prosecutorial error is generally deemed to be waived or forfeited. (*Cassim*, at pp. 794–795; *Rayii v. Gatica* (2013) 218 Cal.App.4th 1402, 1411–1412.) "The primary purpose of the requirement that a defendant object at trial to argument [or other action] constituting prosecutorial misconduct is to give the trial court an opportunity, through admonition of the jury, to correct any error and mitigate any prejudice." (*People v. Williams* (1997) 16 Cal.4th 153, 254.) An exception to the general rule of forfeiture applies when "an objection would have been futile or an admonition ineffective." (*People v. Arias* (1996) 13 Cal.4th 92, 159.)

Salazar references 13 instances of purported prosecutorial error that he argues require reversal of his convictions.[18] However, he does not cite to the record showing that he objected to any of those instances, much less requested that the trial court give curative admonitions. He also does not argue that any objection and/or request for a curative admonition would have been futile or that an admonition would have been ineffectual. (See *People v. Potts* (2019) 6 Cal.5th 1012, 1035.) Accordingly, we conclude that Salazar forfeited his claims of prosecutorial error.[19] (*Potts*, at p. 1035; *Fuiava, supra*, 53 Cal.4th at p. 679; *Riggs, supra*, 44 Cal.4th at p. 298; *Cassim, supra*, 33 Cal.4th at pp. 794–795.)

## F. *Judicial Bias*

Code of Civil Procedure section 170.1 et seq. creates a comprehensive statutory scheme to address claims that a superior court judge should disqualify himself or herself on grounds of actual or apparent bias. Such a disqualification request must be made "at the earliest practicable opportunity after discovery of the facts constituting the ground for disqualification."

[18] Because we conclude that Salazar forfeited his claims of prosecutorial error by not timely and specifically objecting to, and not requesting a curative admonition for, any of those 13 instances, we need not and do not specifically describe each such instance or discuss the merits of his prosecutorial error claim in each instance. We merely note that these purported instances of prosecutorial error primarily consist of: (1) improper vouching for, or arguing in favor of, the credibility of the victims' testimony or other prosecution evidence and (2) asking leading or other improper questions of the victims.

[19] To the extent Salazar requests that we nevertheless exercise our discretion to review the merits of his prosecutorial error claims, we decline to do so. (Cf. *Riggs, supra*, 44 Cal.4th at p. 298 [declining to exercise discretion to review forfeited claims of prosecutorial error].) In any event, based on our review of the record, it is very likely that if we were to address the merits of each claim, we would conclude there was no prosecutorial error under either the federal or state standard. (*Daveggio, supra*, 4 Cal.5th at p. 854.)

(Code Civ. Proc., § 170.3, subd. (c)(1).) Section 170.3 further provides strict time requirements for resolving a motion for disqualification, and decisions on such a motion can only be reviewed on a petition for writ of mandate filed "within 10 days after service of written notice of entry of the court's order determining the question of disqualification." (*Id.*, subd. (d); see *People v. Panah* (2005) 35 Cal.4th 395, 444.) A failure to seek immediate writ review generally forfeits any argument based on the statutory disqualification factors. (*People v. Freeman* (2010) 47 Cal.4th 993, 1000 (*Freeman*).)

Even where a party does not seek—or elects not to pursue—the statutory disqualification remedy, there are rare circumstances where fundamental due process guarantees may require reversal of a judgment on a showing of "the probability of actual bias" by the court that entered the judgment. (*Freeman, supra,* 47 Cal.4th at p. 1006; see also *Caperton v. A.T. Massey Coal Co., Inc.* (2009) 556 U.S. 868, 887 (*Caperton*).) The United States Supreme Court has characterized these due process grounds for judicial disqualification as a "constitutional floor" that supplements "the ceiling set 'by common law, statute, or the professional standards of the bench and bar.' " (*Caperton*, at p. 889, quoting *Bracy v. Gramley* (1997) 520 U.S. 899, 904.) And the California Supreme Court has emphasized that cases meeting this federal constitutional standard will be "extraordinary" ones that involve "extreme" or "exceptional" facts. (*Freeman*, at pp. 1004–1006.) It is not our role "to examine whether the trial judge's behavior left something to be desired, or whether some comments would have been better left unsaid." (*Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 589.)

It is important to recognize at the outset that Salazar never filed a disqualification motion based on the alleged bias of the trial judge. As a result, he forfeited any statutory claims he had based on Code of

Civil Procedure section 170.1. (*Freeman*, *supra*, 47 Cal.4th at p. 1006.) Accordingly, we review his assertions of implied bias under federal constitutional due process standards. (*Id.* at pp. 1004–1006; *Caperton*, *supra*, 556 U.S. at pp. 887–889.)

Salazar first argues that the trial court was implicitly biased in favor of a disabled class of victims and its decisions during trial had the effect of "direct[ing] the jury to believe the victim[s'] testimony." In particular, he contends that "in this trial implicit biases against mentally disabled, disordered, and different Californians took a role in the [c]ourt's decisions to protect victims with mental disabilities from jury bias without explaining to the jury anything about the disabilities that the victims had and how their disabilities, disorders, and conditions may bear on the trial evidence." Salazar's opening brief, however, fails to cite to any specific portions of the record that allegedly show such purported bias, contrary to the requirements of rule 8.204(a)(1)(C).[20] Although such failure could be deemed a forfeiture of the argument (see, e.g., *WFG National*, *supra*, 51 Cal.App.5th at p. 894), we nevertheless attempt to address the merits of his assertion.

As the People note, the trial court instructed the jury with CALCRIM No. 226 regarding evaluation of the credibility of witnesses. That instruction stated in part: "You alone must judge the credibility or believability of the witnesses. . . . You must judge the testimony of each witness by the same standards, setting aside any bias or prejudice you may have." It further instructed that in evaluating a witness's testimony, the jury may consider certain factors, including: "How well was the witness able to remember and describe what happened?" (CALCRIM No. 226.) Thus, the jurors were

---

[20] Rule 8.204(a)(1)(C) provides in part: "Each brief must . . . [s]upport any reference to a matter in the record by a citation to the volume and page number of the record where the matter appears."

clearly told that they alone must determine the credibility of the witnesses who testified at trial, including that of the three victims who testified. Contrary to Salazar's argument, the record does not show that the court directed the jury to believe the testimony of the three victims or otherwise favored those victims or other persons who have physical or mental disabilities, conditions, or limitations. Accordingly, we reject his argument that the court was implicitly biased as he asserts, and conclude that he has not shown any probability of actual bias on the part of the judge that would violate constitutional due process standards. (*Freeman*, *supra*, 47 Cal.4th at pp. 1004–1006; *Caperton*, *supra*, 556 U.S. at pp. 887–889.)

Salazar argues that the court had a sua sponte duty to explain to the jury what disabilities, disorders, and conditions the three victims had and how those disabilities, disorders, and conditions affected the jury's consideration of the trial evidence. But he does not cite, nor have we found, any authority imposing such a sua sponte duty on a trial court. We are thus unpersuaded that the court was biased for not providing such explanations.

Furthermore, although he complains that Gwendolyn was allowed to be the sole witness on her autism condition, he cites no authority suggesting that this indicates judicial bias. Indeed, the record reflects the court's consistent efforts to remain even-handed. Thus, the court instructed pursuant to CALCRIM No. 331 that the jury should consider all of the factors in evaluating the testimony of a witness with a developmental, cognitive, or mental disability, so that "[e]ven though a person with a developmental disability, a cognitive, a mental or a communication impairment may perform differently as a witness because of his or her level of cognitive development, that does not mean he or she is any more *or* less credible than another witness." (Italics added.) That instruction had the proper effect of informing

38

the jury that it alone was charged with determining the credibility of the testimony of Gwendolyn and the other two victims and, in so instructing, the court showed no bias in favor of or against the testimony of the victims or any other witnesses. Contrary to Salazar's conclusory assertion, the instruction did not show any judicial bias in favor of the three victims, much less insulate them from the jury's consideration of any weaknesses in their testimony. We thus reject Salazar's assertion that the court was implicitly biased, concluding that Salazar has not shown a probability of actual bias that would violate constitutional due process standards.

Salazar also asserts that the court had a sua sponte duty to "inquire with authoritative sources to see whether or why the victims have a communication impairment." As we have explained, however, the court properly instructed *the jury* to decide whether and to what extent any or all of the victims exhibited a communication impairment. It was the responsibility of the parties and their lawyers—not that of the court—to investigate the case and present relevant evidence on the questions to be decided by the jury.

Salazar suggests the court was implicitly biased in favor of the victims because it did not sufficiently admonish Gwendolyn "about her non-responsiveness" and did not do "more to prepare and admonish" the other witnesses and the jury. Again, however, he cites no authority showing the court had any duty to prepare and admonish witnesses. As for the jury, Salazar fails to explain why the instructions provided (CALCRIM Nos. 220, 222, 223, 224 and 226) did not adequately inform jurors how to evaluate the testimony.[21]

---

[21] To the extent Salazar repeats his assertions of instructional error in an effort to bootstrap his claim of judicial bias, we do not repeat our analysis explaining why the instructions were proper.

Accordingly, we conclude that Salazar has not carried his burden on appeal to show that the trial court was biased based on its actions or omissions, whether viewed individually or collectively and, in particular, has not shown a probability of actual bias on the part of the court that is too high to be constitutionally tolerable. (*Freeman*, *supra*, 47 Cal.4th at pp. 1004–1006; *Caperton*, *supra*, 556 U.S. at pp. 887–889.) Furthermore, he has not shown, nor have we found, any of "the most 'extreme facts' " that might constitute judicial bias in violation of the due process clause. (*Freeman*, at pp. 1004–1006.)

## G.   *Ineffective Assistance of Counsel*

"A criminal defendant's federal and state constitutional rights to counsel [citations] include[] the right to *effective* legal assistance." (*People v. Mai*, *supra*, 57 Cal.4th at p. 1009, citing U.S. Const., 6th Amend. & Cal. Const., art. I, § 15.) To show on appeal that a defendant was denied effective assistance of trial counsel, the defendant has the burden to show both: (1) counsel's performance was deficient (i.e., it fell below an objective standard of reasonableness under prevailing professional norms); and (2) that deficient performance prejudiced the defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 688, 691–692 (*Strickland*); *Mai*, *supra*, 58 Cal.4th at p. 1009.)

"When examining an ineffective assistance claim, a reviewing court defers to counsel's reasonable tactical decisions, and there is a presumption counsel acted within the wide range of reasonable professional assistance. It is particularly difficult to prevail on an *appellate* claim of ineffective assistance. On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was

40

asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*Mai, supra*, 57 Cal.4th at p. 1009.) "When . . . defense counsel's reasons for conducting the defense case in a particular way are not readily apparent from the record, we will not assume inadequacy of representation unless there could have been ' "no conceivable tactical purpose" ' for counsel's actions." (*People v. Earp* (1999) 20 Cal.4th 826, 896.) "Because the presumption of counsel's competence can typically be rebutted only with evidence outside the record, ineffective assistance claims are normally raised in habeas corpus proceedings where such evidence can be presented." (*People v. Arce* (2014) 226 Cal.App.4th 924, 930, fn. omitted.) Given these requirements, "the failure [of counsel] to object rarely establishes ineffective of counsel [on direct appeal]." (*People v. Kelly* (1992) 1 Cal.4th 495, 540.) "[D]eciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance." (*People v. Hillhouse* (2002) 27 Cal.4th 469, 502.)

To satisfy the second prong for ineffective assistance of counsel, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors the result of the proceeding would have been different." (*Strickland, supra*, 466 U.S. at p. 694.) "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed [by the appellate court]." (*Id.* at pp. 697; see also *People v. Johnsen* (2021) 10 Cal.5th 1116, 1167–1168 (*Johnsen*); *In re Marquez* (1992) 1 Cal.4th 584, 602 (*Marquez*) ["When there has been no showing of prejudice, we need not determine whether trial counsel's performance was deficient"].)

41

In only seven pages of his opening brief, Salazar identifies 22 instances in which he argues his trial counsel performed deficiently.[22] We could treat the arguments as forfeited for failure to present adequate substantive legal analysis. Even if we address the merits, in all but one instance, they appear to involve a purported failure to object or take some other action, and we conclude he has not carried his burden to show prejudice, either individually or cumulatively. As discussed above, when an appellant has not shown prejudice from his or her trial counsel's purported deficient performance, we can dispose of and reject that claim without determining whether his or her trial counsel performed deficiently. (*Strickland*, *supra*, 466 U.S. at p. 697; *Johnsen*, *supra*, 10 Cal.5th at pp. 1167–1168; *Marquez*, *supra*, 1 Cal.4th at p. 602.)

---

[22] Because we dispose of his contention based on his failures to carry his burden on appeal, we need not specifically describe each such instance. In general, those instances primarily consist of his trial counsel's failures to: (1) object to certain leading and other questions that the prosecutor asked the victims and/or to the victims' answers or other testimony; (2) object to admission of certain evidence; (3) request that the trial court give certain limiting, clarifying, or other instructions to the jury; (4) present defense expert witness testimony regarding the victims' disabilities; (5) find cooperative defense witnesses who would testify at trial; (6) present character evidence based on Crystal's claim of having 24 miscarriages; and (7) move for a mistrial. He also appears to argue that his trial counsel performed deficiently when he stipulated to admission of the implied video evidence that potentially existed and explained Gwendolyn's conduct, but which did not actually exist.

Here, our review of Salazar's opening brief reveals he has not shown, much less argued (other than once in a conclusory manner), that any of the 22 instances of purported deficient performance were prejudicial to him (i.e., there is a reasonable probability that he would have obtained a different result absent such deficient performance). (*Strickland, supra*, 466 U.S. at p. 694.) Accordingly, we reject all of Salazar's claims of ineffective assistance of counsel for failure to carry his burden on appeal to show prejudice. (*Strickland*, at p. 697; *Johnsen*, at pp. 1167–1168; *Marquez*, 1 Cal.4th at p. 602.)

In so doing, we need not expressly determine whether Salazar's trial counsel performed deficiently. (*Marquez, supra*, 1 Cal.4th at p. 602.) Nevertheless, if we were to address the first prong of the *Strickland* test (i.e., trial counsel's purported deficient performance), we would conclude that Salazar has not shown his trial counsel could not have had a rational tactical purpose for each of the acts or omissions that Salazar cites. (See *Mai, supra*, 57 Cal.4th at p. 1009.) Here, although Salazar lists 22 acts or omissions purportedly constituting deficient performance by his trial counsel, he makes no substantive legal argument showing that any of those acts or omissions could not have been for a rational tactical purpose,[23] nor does he address whether counsel was ever asked for a reason for any or all of his acts and omissions and failed to provide one. Absent such a showing, Salazar has not

---

[23] For example, Salazar's opening brief argues regarding one instance "where defense counsel should have objected was [Gwendolyn's] conclusive statement about [Salazar] assaulting and raping people. . . . This was legally conclusive and presumed a guilty verdict in this case and unresponsive to defense counsel's question. . . . Defense attorney should have objected to this answer, and failing to do this to [Gwendolyn's] conclusive statements about [Salazar] was ineffective assistance." That argument did not present any substantive legal analysis with regard to why trial counsel might have decided not to object.

carried his burden on appeal to establish that his trial counsel's performance was deficient. (*Mai*, at p. 1009.) Because Salazar has not satisfied either of the two prongs set forth in *Strickland*, we conclude that he has not shown that he was denied effective assistance of counsel. (*Strickland*, *supra*, 466 U.S. at pp. 688, 691–692; *Mai*, at p. 1009.)

## DISPOSITION

The judgment is affirmed.

DATO, Acting P. J.

WE CONCUR:

CASTILLO, J.

RUBIN, J.